**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| GREG ADISHIAN, on Behalf of Himself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>XPEL, INC., RYAN L. PAPE, AND BARRY R. WOOD,<br><br>Defendants. | Civil Action No. 5:24-cv-00873<br><br>**DEMAND FOR JURY TRIAL** |

**CLASS ACTION FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Plaintiff Greg Adishian ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes, without limitation: (a) review and analysis of regulatory filings made by XPEL Inc. ("XPEL" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by XPEL; and (c) review of other publicly available information concerning XPEL.

## NATURE OF THE ACTION AND OVERVIEW

1. This is a class action on behalf of persons and entities that purchased or otherwise acquired XPEL securities between November 8, 2023, and May 2, 2024, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2. Throughout the Class Period, XPEL, which supplies automotive paint protection film, automotive window film, ceramic coatings, architectural window film products, and related tools and equipment to support the installation of these products, misled the market to believe that it would increase its market share penetration by reaching an increasingly large segment of non-enthusiast car customers, which would, in turn, grow its revenue by a substantial percentage in 2023 and 2024. In reality, XPEL knew that its competitors encroached on its market share, undermining its growth. When the truth reached the market, XPEL's stock price suffered significant declines, harming investors.

3. Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business,

operations, and prospects. Specifically, Defendants failed to disclose that: (i) XPEL's competitors were siphoning an increasingly large segment of the market; (ii) as a result, the Company's revenue growth became increasingly dependent upon existing customers and partners; (iii) as a result, the Company's revenue growth for 2023 and 2024 dwindled; and (iv) as a result, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## JURISDICTION AND VENUE

4. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

6. Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this District.

7. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

8. Plaintiff Greg Adishian, as set forth in the accompanying certification, incorporated by reference herein, purchased XPEL securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

9. Defendant XPEL is incorporated under the laws of Nevada with its principal executive offices located in San Antonio, Texas. XPEL supplies automotive paint protection film, automotive window film, ceramic coatings, architectural window film products, and related tools and equipment to support the installation of these products. XPEL's ordinary shares trade on the NASDAQ exchange under the symbol "XPEL."

10. Defendant Ryan L. Pape ("Pape") was the Company's Chief Executive Officer ("CEO"), Director, and Chair of the Board since 2009, 2010, and 2019, respectively.

11. Defendant Barry R. Wood ("Wood") has been the Company's Senior Vice President and Chief Financial Officer ("CFO") since June 2016.

12. Defendants Pape and Wood (together, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive

representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

13. Defendant XPEL and the Individual Defendants are referred to collectively herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

14. XPEL is a provider of protective films and coatings, including automotive paint protection films, surface protection films, automotive and architectural window films, and ceramic coatings. Paint Protection Film, XPEL's flagship product, is a self-adhesive, clear film designed to be applied to painted surfaces of automobiles and other surfaces. The Company's products fall into three categories: (1) Paint Protection Film ("PPF"); (2) Window Film; and (3) Other. PPF sales represented approximately 58.0% of XPEL's consolidated revenue for 2023. XPEL sells and distributes its products through, among others, independent installers, new car dealerships, third-party distributors, Company-owned installation centers, and Automobile Original Equipment Manufacturers ("OEMs").

## FALSE AND MISLEADING STATEMENTS

15. On November 8, 2023, the Company announced its third quarter 2023 financial results and hosted a corresponding earnings call with securities analysts that same day. The Company reported that revenue for the quarter had grown 14% but had missed expectations. Pape noted that there had been a "slight reduction in the rate of growth in [the Company's] aftermarket channel this quarter versus Q2," but attempted to assuage concerns about reaching an expanding customer base by discussing XPEL's channel strategy. Specifically, Pape stated, in relevant part:

> As you analyze our industry, it's important to understand that scaling to meet high penetration rates and dealerships is something a few of the aftermarket installers

are interested in as this scaling requires substantially more human capital and a constant reinvestment of cash flow into the business. Likewise, you don't really see dealership groups universally scale installation internally across their enterprise in a consistent way.

It's typically locally decided, and it's very much a patchwork in its implementation. So even still, as dealerships continue to sell more PPF and ultimately create more awareness for PPF, on the whole, this is not disruptive to the aftermarket in our view, for several reasons. One, the aftermarket participates in this work by doing work for dealerships in some cases, as I mentioned a minute ago. And then enthusiast buyers who are still the largest part of this channel who were the original PPF buyers, will often opt out of the dealership channel and take their new car directly into the aftermarket, seeking a more bespoke installation from someone they trust. And then third, obviously, the PPF market overall has continued to grow.

So net-net, the dealerships offering is increasing attach rates by finding people that would never take their car into the aftermarket. And as dealerships continue to adopt PPF, we've seen interest from the OEMs begin to develop. And again, this interest is profit motivated. Installing PPF out or near the point of manufacturer delivery is attractive because the vehicles are located together for efficiency.

The downside is you need a substantial physical footprint and human capacity to do a considerable number of vehicles as installation is still done manually without any currently available automated installation processes. So there's a limit ultimately to the scale that can be achieved in that environment. Additionally, OEM programs are susceptible to be usurped by dealerships who would prefer to internalize their programs and not select manufacturer's option for the product because they believe they can generate more profit and have more control.

* * *

So when you look at it in totality, we see the mix of channel activities as healthy and mandatory to the development of the PPF market and we don't see direct cannibalization of the business from one segment to another. As an example, even as you have seen more dealership participation in PPF over the past few years, the aftermarket is bigger than it's ever been for XPEL.

In XPEL, we have various internal measures, including our DAP software for estimating our vehicle attach rates for our products and the related revenue mix. In particular, we can look at this attach rate as it relates to traditional paint protection, which would be the front end of a vehicle or the full car of the vehicle, separate from, say, mini kits or wear-and-tear applications that would be additional.

So as an example, in the case of Rivian, with whom we have a factory program, our U.S. XPEL aftermarket attach rates are higher than many other mates. In this case, the OEM program is incremental and is helping to grow attach rates overall. It's

> our view that initial buyers of a new model or a new brand like the recent development of the EV manufacturers are more likely to skew towards enthusiasts.
>
> So we would expect attachment rates to be higher initially, but over time, if there's more mass market appeal, particularly if the price point is more accessible, the buyer profile will change to be more similar with the overall industry dynamics. So put simply, the incremental buyer of this type is less likely to be an enthusiast.
>
> This means, over time, we might expect to see attach rates go down on a new vehicle as they expand production and their mass market appeal. So today, as an example, our U.S. attach rate into Rivian is substantially higher than Tesla, for example, even excluding our OEM operation, and this is likely due to the early presence of the enthusiast buyer dominating the channel for a new vehicle.
>
> *   *   *
>
> We estimate 25% of consumers will never buy the product and they probably wouldn't take it for free because the pride of ownership of their vehicle is just not there. Those consumers simply don't care. But at least 50% to 60% of the new car buyer in our estimation that are open to the product if they learn about it, if they can access it easily before, during or after the sale process, and if we can meet them with an appropriate price point to provide good value.
>
> To do that, we'll take a variety of sales channels and marketing activities to reach this group over time. So I know that's a lot to digest on our U.S. go-to-it, but to summarize, our channel strategy uniquely positions us to be there wherever the demand takes us and is a key part of our ability to drive sustained growth.

16. Towards the end of the earnings call, Pape expressed confidence for 2024 revenue growth, even if that growth was not at the same 20% growth rate to which investors may be accustomed. Specifically, Pape stated, in relevant part:

> So I think with that caveat in mind, if we were to see kind of the tempo that we're in now continue, I think we would be looking in a 2024 environment at kind of a 15% to 20% sort of organic growth rate. That's kind of how we see it. That then subject to change from sort of the inorganic acquisition components.
>
> And then obviously, to the downside, it's the recession risk or the auto market lose a steam from the pace it's been on, that would potentially challenge that to the downside. But I think we see enough opportunity and we see angles for organic growth into the future to give us kind of that sustained organic growth rate? Are we going to hit 20% compounded organically year-over-year? That might be a little a little tough as you get to larger numbers. But I think if you could get to 15% to 15-plus percent, that would be good in this environment.

17. The above statements identified in ¶¶15-16 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose that: (1) XPEL's competitors were siphoning an increasingly large segment of the market; (2) as a result, the Company's revenue growth became increasingly dependent upon existing customers and partners; (3) as a result, the Company's revenue growth for 2023 and 2024 dwindled; and (4) as a result, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## THE TRUTH EMERGES

18. On May 2, 2024, the Company announced its first quarter 2024 financial results, reporting only 5% revenue growth year-over-year — well below analyst expectations. During the earnings call, hosted on the same day, Pape admitted that the Company had been losing customers in the aftermarket channel:

> If you think about our core enthusiast customer who still makes up a substantial portion of our customer base, they began to adopt EVs. ***But more importantly, the EV revolution, if you will, it created a new class of enthusiasts. And these were not traditionally our customers***. They were an enthusiast by virtue of the EV cycle. And if that market has cooled, the EV market is cooled the EV buyers lured to the market now by discounting in this part of the cycle are probably less likely to be our customer in the aftermarket.
>
> ***So in that sense, EV sales declines probably hurt us twice, once on volume, but also by shifting the composition of those buyers to those that have a lower propensity to participate in the automotive aftermarket in general***. So I think it highlights also the continued need to reach all types of customers, including those that would not normally participate in the aftermarket***. So programs like we had with Rivian, OEM, other OEM programs, dealership activation for us and for our installers in the aftermarket. These are all things that help do that, and it's why we're focused on that***.[1]

[1] Unless otherwise noted, all emphasis is added and internal citations are omitted.

19. On this news, XPEL's stock price fell $20.93, or nearly 39%, to close at $32.86 per share on May 2, 2024, on unusually heavy trading volume.

**CLASS ACTION ALLEGATIONS**

20. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired XPEL securities between November 8, 2023, and May 2, 2024, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

21. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, XPEL's shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of XPEL shares were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by XPEL or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

22. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

23. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

24. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' actions as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of XPEL; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

25. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

26. The market for XPEL's securities was open, well-developed, and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, XPEL's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class, relying upon the integrity of the market price of the Company's

securities and market information relating to XPEL, purchased or otherwise acquired XPEL's securities, and have been damaged thereby.

27. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of XPEL's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about XPEL's business, operations, and prospects as alleged herein.

28. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about XPEL's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating, in the market, an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

29. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

30. During the Class Period, Plaintiff and the Class purchased XPEL's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

31. As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding XPEL, their control over, and/or receipt and/or modification of XPEL's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning XPEL, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

32. The market for XPEL's securities was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, XPEL's securities traded at artificially inflated prices during the Class Period. On April 9, 2024, the Company's share price closed at a Class Period high of $59.15 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying

upon the integrity of the market price of XPEL's securities and market information relating to XPEL, and have been damaged thereby.

33. During the Class Period, the artificial inflation of XPEL's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about XPEL's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of XPEL and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and, when disclosed, negatively affected the value of the Company's shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

34. At all relevant times, the market for XPEL's securities was an efficient market for the following reasons, among others:

(a) XPEL shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, XPEL filed periodic public reports with the SEC and/or the NASDAQ;

(c) XPEL regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) XPEL was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

35. As a result of the foregoing, the market for XPEL's securities promptly digested current information regarding XPEL from all publicly available sources and reflected such information in XPEL's share price. Under these circumstances, all purchasers of XPEL's securities during the Class Period suffered similar injury through their purchase of XPEL's securities at artificially inflated prices and a presumption of reliance applies.

36. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

37. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and

conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of XPEL who knew that the statement was false when made.

## FIRST CLAIM

**Violation of Section 10(b) of the Exchange Act and**
**Rule 10b-5 Promulgated Thereunder**
**Against All Defendants**

38. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

39. During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase XPEL's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each individual defendant, took the actions set forth herein.

40. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which

operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for XPEL's securities in violation of Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

41. Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about XPEL's financial well-being and prospects, as specified herein.

42. Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein, in an effort to assure investors of XPEL's value and performance and continued substantial growth; which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts, necessary in order to make the statements made about XPEL and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein; and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

43. Each of the Individual Defendants' primary liability and controlling-person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the

creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

44. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein; or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly, and for the purpose and effect of concealing XPEL's financial well-being and prospects from the investing public – and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

45. As a result of the dissemination of materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of XPEL's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the

securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants – but not disclosed in public statements by Defendants during the Class Period – Plaintiff and the other members of the Class acquired XPEL's securities during the Class Period at artificially high prices, and were damaged thereby.

46. At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that XPEL was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their XPEL securities; or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

47. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

48. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

49. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

50. Individual Defendants acted as controlling persons of XPEL within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's

operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

51. In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

52. As set forth above, XPEL and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

DATED: August 8, 2024

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

*/s/ Cameron Cano*
Cameron Cano (24101314)
7718 Wood Hollow Drive, Suite 105
Austin, TX 78731
Telephone: (737) 843-2007
ccano@scott-scott.com

Thomas L. Laughlin, IV (*pro hac vice* forthcoming)
Jonathan Zimmerman (*pro hac vice* forthcoming)
Nicholas S. Bruno (*pro hac vice* forthcoming)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile: (212) 223-6334
tlaughlin@scott-scott.com
jzimmerman@scott-scott.com
nbruno@scott-scott.com

**THE SCHALL LAW FIRM**
Brian J. Schall
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: (310) 301-3335
Facsimile: (310) 388-0192
brian@schallfirm.com

*Counsel for Plaintiff Greg Adishian*

# CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

1. I, Greg Adishian, make this declaration pursuant to §27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or §21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2. I have reviewed a complaint against XPEL, Inc. ("XPEL" or the "Company") and authorize the filing of a comparable complaint on my behalf.

3. I did not purchase or acquire XPEL securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4. I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired XPEL securities during the class period, including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5. The attached sheet (Schedule "A") lists all of my transactions in XPEL securities during the Class Period, as specified in the Complaint.

6. During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7. I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct this day of 8/5/2024.

Signed by:
88F788709670431...

Greg Adishian

# Schedule A

| | | | | |
|---|---|---|---|---|
| **XPEL INC** | **Ticker:** | **XPEL** | **Cusip:** | **98379L100** |
| Class Period: 11/08/2023 to 05/02/2024 | | | | |
| **Greg Adishian** | | **DATE** | **SHARES** | **PRICE** |
| | **Purchases:** | 1/31/2024 | 4,600 | $53.88 |